Anthony W. Merrill (#022598)
Jonathan G. Brinson (#025045)
Ryan P. Hogan (#036169)
SNELL & WILMER L.L.P.
One East Washington Street
Suite 2700
Phoenix, Arizona 85004-2556
Telephone:  602.382.6000
Facsimile:  602.382.6070
E-Mail: amerrill@swlaw.com
            jbrinson@swlaw.com
            rhogan@swlaw.com

*Attorneys for Plaintiffs Discovery Land Company,
LLC; Baker's Bay Associates, LLC, Passerine at
Abaco Holdings, LTD, Starfish Construction, LTD*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Discovery Land Company, LLC; Baker's Bay Associates, LLC; Passerine at Abaco Holdings, LTD; Starfish Construction, LTD, | No. |
| Plaintiffs, | **COMPLAINT** |
| v. | (Jury Trial Requested) |
| Certain Underwriters at Lloyd's, London, Kiln Syndicate 510, | |
| Defendant. | |

Plaintiffs Discovery Land Company, LLC, Baker's Bay Associates, LLC, Passerine at Abaco Holdings, LTD, and Starfish Construction, LTD (collectively the "Starfish Parties") assert the following claims for declaratory relief, breach of contract, and breach of the duty of good faith and fair dealing against defendant Certain Underwriters at Lloyd's, London, Kiln Syndicate 510 ("Underwriters"):

**INTRODUCTION**

1.      This action arises from Underwriters' wrongful refusal to indemnify and defend the Starfish Parties for insured losses resulting from four separate occurrences covered under two insurance policies issued by Underwriters.

2.      Underwriters breached both policies by refusing to pay covered claims.

3.      The Starfish Parties met all conditions precedent to coverage under the policies.

4.      Underwriters breached their obligation of good faith and fair dealing, including, but not limited to, by failing to timely acknowledge the Starfish Parties' claims, failing to timely conclude its investigation, ignoring clear evidence of coverage, failing to timely provide Plaintiffs its coverage position, failing to participate in resolution of covered claims, and unreasonably withholding payment on covered claims.

5.      The Starfish Parties seek an award for damages, punitive damages, attorney's fees and costs, and a declaration of the parties' rights under the policies.

**THE PARTIES**

6.      Discovery Land Company, LLC ("DLC") is a Delaware limited liability company with its principal place of business in Maricopa County, Arizona. DLC is affiliated and associated with Baker's Bay, Passerine at Abaco Holdings, and Starfish Construction, through a commonality of ownership or through a services agreement to manage Starfish's operations at Baker's Bay. This association and affiliation is why each of Underwriters' policies specifically listed the Named Insureds' address as "14605 N. 73rd Street, Scottsdale, AZ 85280." DLC paid for many of the Starfish Parties' defense costs in the underlying matters which are the subject of recovery in this action.

7.      Baker's Bay Associates, LLC is a Delaware limited liability company with its principal place of business in Beverly Hills, California.

8.      Passerine at Abaco Holdings, LTD is a Bahamas limited company doing business in the Bahamas.

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

9.    Starfish Construction LTD ("Starfish"), is a Bahamas limited company doing business in the Bahamas.

10.    Defendant Certain Underwriters at Lloyd's, London, Kiln Syndicate 510 is a Lloyds of London insurance syndicate organized and operating under the laws of England, with its principal place of business in England.

**JURISDICTION AND VENUE**

11.    This Court has diversity jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of this state and citizens of foreign states.

12.    This lawsuit arises out of insurance policies Nos. B0621 CMLCA0115N01, with a March 31, 2015 to March 31, 2018 policy period (the "Phase 3 Policy") and B0621 CMLCA0115N19, with a February 25, 2016 to February 25, 2019 policy period (the "Phase 4 Policy") (collectively the "Policies"), that were negotiated, entered into, issued for delivery, and to be performed in the State of Arizona. True and correct copies of the Phase 3 and Phase 4 Policies are attached hereto as **Exhibits A & B** respectively.

13.    At all material times, Underwriters knew that they were providing Arizona coverage, as the very first page of both Policies list the Insureds' Arizona address, and the Policies were delivered to the Insureds in Scottsdale, Arizona.

14.    The "Risk Details" at the beginning of the Policies provide that "[a]ny disputes arising under or in connection with it shall be subject to the exclusive jurisdiction of the Bahamas' courts **and** the courts of the United States of America." (emphasis added).

15.    Any choice-of-law provision found in the Policies are void and unenforceable under A.R.S. § 20-1115 because the Policies were issued for delivery in Arizona and denote the Insureds' principal place of business in Arizona. Under that statue, Arizona law governs the Policies.

16.    Additionally, the choice-of-law provisions are vague and unenforceable because they materially conflict with one another and Arizona law has the most significant relationship to the Policies.

- 3 -

17.     This Court has personal jurisdiction over Underwriters.

18.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) and (c)(2) because this Court has personal jurisdiction over Underwriters such that Underwriters are deemed to be residents of the State of Arizona.

## THE INSURANCE POLICIES

19.     The Policies cover the Starfish Parties' "activities as contractors and property owners and/or operations connected thereto in respect of construction" of Phases 3 and 4.

20.     The Policies include an "Extended Products-Completed Operations Hazard Endorsement" that includes coverage beyond the policy period. "This coverage extension will be equal to the applicable statute of limitations or maximum policy extension agreed herewith," which "extension will not exceed ten (ten) (sic) years from 'your work' being completed. Any 'bodily injury' or 'property damage' subject to this coverage extension will be deemed to have occurred on the date 'your work' is deemed completed."

21.     The Policies provide coverage to "Baker's Bay Associates, LLC / Passerine at Abaco Holdings, LTD; Starfish Construction, LTD and/or Affiliated, Associated and Subsidiary Companies for their respective rights and interests."

22.     Although capitalized, the Policies do not define the terms "Affiliated" or "Associated." Those terms commonly mean "closely associated with another" or "joined together often in a working relationship . . . related, connected or combined together." *See* Merriam-Webster, https://www.merriam-webster.com/dictionary/affiliated & https://www.merriam-webster.com/dictionary/associated.

23.     DLC is both associated and affiliated with the other Starfish Parties, with common ownership between DLC and through control or management of Starfish's operations at Baker's Bay, the Named Insureds' address listed the same as DLC's in the Policies, and DLC paying many of the attorney's fees in the underlying matters that is now at issue in this action.

24.     The Named Insureds' address listed on both Policies is "14605 N 73rd Street, Scottsdale, AZ 85260."

25.    The Policies' "Operative Clause" provides the Starfish Parties with indemnity "against their liability to pay damages (including claimants' costs, fees and expenses) in accordance with the law of any country."

26.    Under Paragraph 10, the Starfish Parties are indemnified "against liability arising out of or in connection with any Product."

27.    "Product" is defined to mean "any property after it has left the custody or control of" the Starfish Parties.

28.    The Policies also require Underwriters to reimburse the Starfish Parties for "Defence Costs," which are defined as "all costs, fees and expenses . . . in the investigation, defense or settlement of . . . [or] as a result of representation at any inquest, inquiry or other proceedings in respect of matters which have a direct relevance to any occurrence which forms or could form the subject of indemnity by this Policy."

29.    The Starfish Parties have exhausted any other insurance treated as primary and non-contributory to the Policies. Specifically, the Starfish Parties have exhausted coverage under the United Specialty Insurance Company ("USIC") policies (as set forth more fully below).

30.    Arizona law governs the interpretation of the Policies.  *See* A.R.S. § 20-1115; *Frank v. Certain Underwriters at Lloyds London Syndicate 4141*, 2011 WL 1770536, at *6 (D. Ariz. May 10, 2011) ("Delivery of a policy may be defined as the act of the insurer of placing a policy in the control of the insured or someone on his or her behalf or of holding the policy for him or her subject to his or her direction").

31.    Arizona has the most significant relationship to the Policies given that the Policies were negotiated from Arizona, delivered in Arizona, contain the Named Insureds' address in Arizona, and are to be performed by Underwriters in Arizona through payment of indemnification and defense costs to the Insureds there.

32.    The Starfish Parties faithfully paid all premiums owed under the Policies in order to obtain insurance coverage and protection from Underwriters.

33.     Under the Policies, the applicable limit of indemnity is $5,000,000 for "any one occurrence and in the annual aggregate for Products and Pollution Liabilities."

34.     Underwriters' obligation to pay "Defence Costs" is in addition to this limit.

35.     The Phase 3 Policy provides coverage for the O'Grady Residence and Lot 94. Lot 94 is referred to herein as the "Lovett-Walton Residence."

36.     Endorsement 1 to the Phase 4 Policy provides coverage for Lot 47. Lot 47 is referred to herein as the "Godvin Residence."

37.     Endorsements 2 and 3 to the Phase 4 Policy provide coverage for the Sunrise Beach Flats.

## FACTUAL BACKGROUND

38.     This action stems from liability for which the Starfish Parties paid millions of dollars in connection with homes built and developed at Baker's Bay Golf & Ocean Club located on Great Guana Cay, Abacos, Bahamas ("Baker's Bay").

### The Godvin Claim

39.     In 2016, the Godvin family entered into an AIA103-2007 Standard Form Agreement with Starfish for the construction of the Godvin Residence.

40.     On December 14, 2017, the Bahamian Ministry of Public Works & Transportation issued a certificate of occupancy for the Godvin Residence. The Godvin family moved in to the Godvin Residence on December 22, 2017.

41.     On December 26, 2017, water damage was discovered on the first floor of the Godvin Residence. It was later discovered that a six-foot level and coils of construction nails had blocked a three-inch wide sanitary line for a toilet on the Godvin Residence's second floor.

42.     On January 14, 2018, additional water damage was discovered in the Godvin Residence resulting from a blockage to an icemaker's water line which itself required repairs to the bar cabinets, carpet, and hardwood flooring in the bar room and great room.

43.     As a result of these leaks, the Starfish Parties engaged in significant remediation work on the Godvin Residence. The Starfish Parties removed and replaced the

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

hardwood flooring in the affected rooms on the first floor, removed and replaced portions of the baseboards and drywall in the affected rooms, and removed and reinstalled the cabinets, appliances, countertop, drapery and furniture in the effected rooms.

44.     The flooring that was installed in the Godvin Residence had to be stripped and refinished.

45.     The Starfish Parties also needed to add self-leveling concrete to properly complete the remediation of the hardwood flooring.

46.     All told, this remediation work cost the Starfish Parties $342,700.33.

47.     The Starfish Parties notified Underwriters and their assigned independent adjusting firm, Charles Taylor Adjusting, regarding the details of the leaks found on the Godvin Residence and the resulting damages on or about May 16, 2018.

48.     At time of this notification, Charles Taylor Adjusting appointed Alexcarlo Rodriguez to adjust the Godvin Residence claim and the Starfish Parties sent Mr. Rodriguez a drop box full of informative pictures and other information at his request.

49.     Underwriters through Mr. Rodriguez then inspected the Godvin Residence in June 2018 but then went silent with no follow-up or communication to the Starfish Parties.

50.     It was not until May 2021 that the Starfish Parties were notified that Mr. Rodriquez was no longer on the case and that Cody Kinchen with Charles Taylor Adjusting was the newly assigned adjuster.

51.     As the Starfish Parties did with Mr. Rodriguez, considerable time was spent educating Mr. Kinchen on the Godvin Residence claim, answering his questions, and providing the same information.

52.      To the surprise of the Starfish Parties, Mr. Kinchen—like Mr. Rodriguez— went silent and in October 2021 the Starfish Parties received a returned undeliverable email in response to a status request.

53.     Sometime thereafter, the Starfish Parties learned that the claim was reassigned to Esteban Balbis of Charles Taylor Adjusting, the third adjuster.

54.     Again, the Starfish Parties were requested to educate Mr. Balbis on the Godvin Residence claim and the Starfish Parties re-sent all the data previously sent to the other adjusters to Mr. Balbis.

55.     Sometime in December 2021, the Starfish Parties were advised that Mr. Balbis was no longer involved in the claim and to date the Starfish Parties have not received any further information as to assigned adjuster handling the claim, if any.

56.     Despite having sufficient information to pay this claim and having a duty to promptly inform its policyholder of coverage decisions, Underwriters itself or through Charles Taylor Adjusting did not provide the Starfish Parties with a coverage position for several years.

57.     Over the years, the Starfish Parties cooperated with Underwriters and Charles Taylor Adjusting and quickly provided any requested information no matter how many adjusters asked or were assigned to the claim. Underwriters itself or through Charles Taylor Adjusting, however, went silent and become nonresponsive.

58.     Not until March 21, 2022, did Underwriters through its coverage counsel issue a reservation of rights letter to Starfish, now requesting further additional documentation, much of which was already provided previously.

59.     To date, Underwriters has not made a formal coverage determination and Underwriters has failed to pay any portion of the $342,700.33 expended on the Godvin Claim.

**The Sunrise Beach Flats Claim**

60.     Starfish also entered into a contract to construct several units at the Sunrise Beach Flats at Baker's Bay.

61.     On August 14, 2018, the Bahamian Ministry of Public Works & Transportation issued a certificate of occupancy for Units 7, 8, 9, and 10 of the Sunrise Beach Flats located at Baker's Bay (the "SRBF Units").

62.     On or around November 6, 2018, the SRBF Units were damaged by a moisture incursion. Professional testing confirmed that the moisture levels in the wood

Snell & Wilmer

L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

flooring of the SRBF Units were above the manufacturer's recommended levels. Further investigation revealed that the suspended slab, sound mat, and Gypcrete assembly had retained excessive moisture. The moisture was absorbed into the wood flooring, causing raised and separated grains in the flooring in addition to water staining.

63.     This moisture incursion and resulting damages required the Starfish Parties to conduct remediation work on the units. In addition to their investigation, the Starfish Parties had to remove and replace flooring; isolate flooring and remove furniture; disconnect and reinstall plumbing and related fixtures, toilets, and sinks; remove and reinstall countertops and appliances; disconnect electricity to the SRBF Units; remove and replace the cabinetry and baseboard; clean, repair, dehumidify, and cure the Gypcrete; repaint and touch up the SRBF Units; and reperform the punch and conduct a final clean.

64.     All told, the resulting damages and remediation work required on the SRBF Units cost the Starfish Parties $675,065.09.

65.     The Starfish Parties timely provided Underwriters with notice of the SRBF Units Claim on April 2, 2020.

66.     As with the Godvin Claim, Underwriters delegated their adjusting functions on the SRBF Units to Charles Taylor Adjusting.

67.     Neither Underwriters nor Charles Taylor Adjusting conducted a timely investigation and did nothing with the SRBF Units Claim for years, until April 2022, when Charles Taylor Adjusting issued an untimely reservation of rights letter. This letter also requested further additional documentation, much of which was already provided previously.

68.     Similar to the Godvin Claim, Charles Taylor Adjusting assigned three separate adjusters, three separate times (two which were the same as on the Godvin Residence) to adjust the SRBF Units Claim.

69.     The adjuster changes by Charles Taylor Adjusting and similar requests from each adjuster for the same information caused serious delays in the investigation and timely adjusting of the SRBF Units Claim.

70.     To date, Underwriters has not made a formal coverage determination and has failed to pay any portion of the $675,065.09 that the Starfish Parties expended on the SRBF Units Claim.

### The Lovett-Walton Claim

71.     On April 16, 2015, Lovett-Walton entered into an AIA103-2007 Standard Form Agreement with Starfish to construct the Lovett-Walton Residence.

72.     Construction of the Lovett-Walton Residence completed on January 11, 2017.

73.     On September 1, 2019, Hurricane Dorian made direct contact with the Bahamas. The hurricane hit and stalled over Baker's Bay, Abaco, the Bahamas, for multiple days.

74.     The hurricane caused damage to the Lovett-Walton Residence, for which Lovett-Walton asserted the Starfish Parties were legally responsible.

75.     On April 2, 2020, the Starfish Parties gave notice of the Lovett-Walton Claim to USIC and Underwriters.

76.     On February 18, 2021, Lovett-Walton filed a demand for arbitration alleging that Starfish was at fault for damages sustained during Hurricane Dorian.

77.     Specifically, Lovett-Walton alleged that Starfish breached the Standard Form Agreement by (i) failing to construct the Lovett-Walton Residence in accordance with the plans, specifications, and building codes when it installed certain roofing components; (ii) failing to comply with the plans and specifications when it improperly installed the glass slider doors without door locking pins at the top and bottom of the doors; and (iii) failing to complete a punch list after having notice to install the missing door locking pins.

78.     In its demand for arbitration, Lovett-Walton sought $5,024,134.00 in resulting damages.

79.     Underwriters never gave a formal coverage determination on the Lovett-Walton Claim, but USIC defended the Lovett-Walton Claim pursuant to a primary general liability WRAP policy under policy number BTO1517605 and an excess liability WRAP policy under policy number BUO1513326.

80.     The Lovett-Walton Arbitration required significant expenses. Both parties retained experts including weather experts to provide opinions regarding the causation and extent of damages Lovett-Walton claimed.

81.     On June 1, 2021, the Starfish Parties participated in a mediation to potentially settle the Lovett-Walton Arbitration, but the parties could not reach a resolution and Underwriters did not offer any funds for settlement.

82.     On June 7, 2022, Lovett-Walton served a pre-hearing demand on the Starfish Parties for $4,750,000. The Starfish Parties advised Underwriters of the pre-hearing demand on June 8, 2022, requesting that Underwriters contribute to avoid potentially greater exposure at an arbitration hearing.

83.     On June 10, 2022, Underwriters' counsel responded by erroneously claiming they were not aware of the Lovett-Walton Claim until recently.

84.     On June 28, 2022, the Starfish Parties' defense counsel in the Lovett-Walton Arbitration reiterated the request for Underwriters' participation in resolving the Lovett-Walton Claim, advising there was still a possibility to settle "between $3M-$4M" but only if Underwriters acted quickly.

85.     Underwriters waited until July 1, 2022, to respond, and then only asked for "position statements/allegations related to" the Lovett-Walton Arbitration and the related O'Grady Arbitration.

86.     Starfish's defense counsel immediately sent Underwriters the notice, pre-mediation demand statement, and the pre-hearing demand.

87.     On July 6, 2022, Starfish's defense counsel reached back out to Underwriters, notifying Underwriters that a settlement discussion would take place in a few hours and requesting "[a]ny news" from Underwriters on coverage.

88.     Underwriters' counsel responded by claiming that they did not even have their own "full Policy forms for the Lovett[-]Walton property" and asked the Starfish Parties to forward the Policy forms to "greatly expedite Underwriters' ability to respond."

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

89. Despite having defense and indemnification obligations, Underwriters did nothing whatsoever to help reach a reasonable resolution prior to the arbitration hearing.

90. A hearing was held on July 25, 2022, to July 28, 2022, and coverage counsel for Underwriters **actually attended that hearing**.

91. On September 21, 2022, the arbitration panel issued a Final Award in favor of Lovett-Walton and against Starfish. The panel concluded that Lovett-Walton established entitlement to damages made necessary as a result of Starfish's breach of contract—$4,825,529.75—plus $85,907.72 in interest for a total award of $4,911.437.47. The panel also ordered Starfish to reimburse Lovett-Walton for $71,107.99 in arbitration fees.

92. USIC paid $4,663,238.36 to partially satisfy the Lovett-Walton award, which exhausted the limits of USIC's primary and excess liability WRAP policies.

93. On October 18, 2022, the Starfish Parties sent Underwriters a demand letter for indemnification of the Lovett-Walton Claim. The Starfish Parties explained that USIC had agreed to tender the full amount left under the limits of its policies to satisfy the Lovett-Walton award but there was still a deficit of $319,307.10. The Starfish Parties demanded that Underwriters indemnify Starfish for this deficit in addition to "all other outstanding legal fees, AAA expenses and other expense including expert's fees/costs not covered previously by USIC."

94. On or around October 19, 2022, after receiving no response from Underwriters, Starfish's defense counsel delivered the $319,307.10 to Lovett-Walton's counsel to satisfy the deficit.

95. In addition, Starfish bore $69,371.59 in fees for its attorneys and the AAA, which should have been covered under the Phase 3 Policy as Defence Costs.

96. Underwriters failed to contribute anything towards defense costs and the damages award, and failed to act in good faith to reach a settlement that would have been far less than the resulting damages award.

97. Underwriters have still not made a formal coverage determination, and have failed to contribute in any way to the $388,678.69 expended on the Lovett-Walton Claim.

**The O'Grady Claim**

98.    On December 6, 2014, the O'Grady Family entered into an AIA A103-2007 Standard Form Agreement with Starfish for O'Grady Residence.

99.    Construction was completed on the O'Grady Residence in the summer of 2018.

100.    Like Lovett-Walton, O'Grady alleged that Starfish was at fault for damages sustained during Hurricane Dorian.

101.    On April 2, 2020, the Starfish Parties gave Underwriters notice of the O'Grady Claim.

102.    On December 1, 2020, Underwriters issued a belated reservation of rights letter to the Starfish Parties. In addition to claiming to reserve Underwriters' rights under the Policy, the letter also stated that Underwriters needed additional information to make a coverage determination.

103.    On December 11, 2020 the Starfish Parties responded to advise Underwriters that O'Grady had filed a Notice of Arbitration against Starfish in the AAA and that a conference call was set for December 23, 2020.

104.    On or around December 15, 2020, O'Grady filed a Demand for Arbitration, with claims and allegations similar to those raised in the Lovett-Walton Claim, and seeking damages amounting to $6,000,000.

105.    On December 28, 2020, Underwriters continued to request information, asking for more documents to support the O'Grady claims and allegations, in addition to documents "identifying the scope, type, and extent of work," performed by Starfish, subcontractors, or other design professional on the O'Grady Residence.

106.    The very next day, on December 29, 2020, the Starfish Parties complied and sent a number of additional documents.

107.    On January 5, 2021, counsel for Underwriters reached out to schedule a conference call. Following the call, the Starfish Parties continued to provide more information at Underwriters' request, including additional documentation and to advise on

- 13 -

the status of the arbitration proceedings.

108.    On March 4, 2021, counsel for Underwriters requested a status update on the O'Grady Arbitration. That same day, the Starfish Parties advised that arbitration was stayed pending a mediation to explore settlement. At a time when the Starfish Parties faced significant liability and needed the assurances they purchased through substantial premiums, Underwriters remained hidden without providing any assistance or correspondence whatsoever for over a year.

109.    A mediation was held on July 27, 2021, without Underwriters' participation. The mediation concluded with O'Grady and Starfish unable to agree on how to settle their dispute.

110.    On June 8, 2022, the Starfish Parties reengaged communications with Underwriters with respect to all four claims underlying this action. The Starfish Parties explained that Underwriters had stopped requesting additional information from their insureds and had never made a coverage determination. The Starfish Parties further advised that they faced exposure to liability beyond the limits of USIC's policies. In addition to the pre-arbitration demand in the Lovett-Walton Arbitration, O'Grady had made a demand of $2,500,000 in resulting damages plus an agreement to correct and rebuild the resulting damages at cost. Starfish even advised that it would shoulder the repair aspect of the O'Grady demand if Underwriters would simply come to an agreement with USIC on the demand's cash component—a favorable settlement structure to Underwriters. Once again, Underwriters did nothing and did not even respond to the proposal.

111.    On October 18, 2022, the Starfish Parties sent a demand to Underwriters to indemnify the Starfish Parties for the O'Grady Claim. The demand advised, among other things, that Underwriters had been on notice of the claim for some time but had failed in every aspect of handling the O'Grady Claim "including, but not limited to, formal communication, investigating damages, investigating coverages, failing to provide a defense, failing to pay for a defense, and failing to cooperate and/or participate alongside the Insured's co-insurer."

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

112.    Underwriters' inaction exposed Starfish to damages exceeding $5,000,000.

113.    On October 24, 2022, having heard no response, the Starfish Parties checked in on Underwriters and reiterated that "time is of the essence here on O'Grady."

114.    On October 25, 2022, Underwriters responded that "we will let you know if anything further is needed. We have a call set with your defense counsel for this afternoon, and then a call with our clients for later this week. Please keep us apprised of updates."

115.    On October 27, 2022, the Starfish Parties advised that O'Grady was seeking to depose witnesses to prepare for the arbitration hearing. At that time, the Starfish Parties again implored Underwriters to become involved in the O'Grady claim.

116.    Underwriters did not provide a clear answer to the Starfish Parties' request for coverage. Instead, Underwriters advised only that the O'Grady claim was "on our radar."

117.    On October 31, 2022, the Starfish Parties further supplemented the now longstanding requests for coverage of the O'Grady Claim. Starfish advised of an opportunity for settlement, which was only possible if "the cash portion will come from [Underwriters]."

118.    In this same correspondence, the Starfish Parties also warned Underwriters that O'Grady had already spent over $250,000 in attorneys' fees and was willing to take the matter to a full hearing knowing full well the result of the Lovett-Walton Arbitration.

119.    The Starfish Parties requested a decision from Underwriters "**before end of business (PST) on November 3, 2022**[,]" and if Underwriters refused to contribute to the global demand, an immediate policy position from Underwriters explaining that refusal.

120.    On November 3, 2022, Underwriters still did not provide a clear position on coverage, writing: "We will be getting back to you very shortly," and requesting engineer expert reports and quantification of damages.

121.    The Starfish Parties once again immediately responded to Underwriters and reiterated that "[t]oday is the absolute deadline for a response from your client before [Starfish is] forced to take action. As we have discussed, we cannot allow essentially the

same arbitration panel to decide this case given the real risk of a similar Lovett-Walton result when the case can settle for a fraction of the potential exposure."

122. Underwriters once again responded with meaningless assurances and additional requests in order to simply avoid ever providing support or payment to their Insureds at a time the Insureds faced significant exposure.

123. The Starfish Parties promptly replied: "It is truly unfortunate and very disappointing that [Underwriters] remains on the side-lines while its Insured is fully exposed. Starfish is left with no choice now but to mitigate its damages and do what is necessary to protect itself. If your client provides you with authority to resolve the O'Grady and Lovett-Walton matters, please reach out."

124. On November 8, 2022, the Starfish Parties once again reached out to Underwriters to advise that they had paid AAA fees in the sum of $56,112.50 that were covered as Defence Costs under the Policies.

125. On November 16, 2022, the Starfish Parties provided a further update, writing that Starfish had "reached an agreement in principle with Tom O'Grady [that] will require a cash settlement payment from Starfish to O'Grady in the sum of $2,400,000.00 and a commitment from Starfish to re-build the residence under a standard Cost-Plus Contract." The Starfish Parties demanded that Underwriters pay for the settlement and legal fees incurred in the matter.

126. On November 28, 2022, the Starfish Parties followed up with Underwriters' counsel who had not responded to Starfish's November 16, 2022, request. Once again, the Starfish Parties reiterated that "[t]ime is of the essence here."

127. On November 29, 2022, Underwriters asked for more information yet again, requesting "the email correspondence with Claimant's counsel confirming settlement."

128. Given Underwriters' failure to assist in any way with the Claim, on November 30, 2022, the Starfish Parties declined to produce settlement negotiation correspondence and provided Underwriters with another opportunity to step in and provide the protection purchased by their Insureds.

129. On December 6, 2022, having heard no response from Underwriters, the Starfish Parties reached out to provide Underwriters with updated legal expenses incurred to date in the O'Grady and Lovett-Walton Claims, writing "Starfish continues to look to your client for full and complete indemnity related to all costs and expenses including the settlement or arbitration payments made or to be made related to these cases."

130. On December 14, 2022, Underwriters finally wrote back to the Starfish Parties to ask "about the jump from the $1.5 million cash demand to $2.4 million settlement amount with O'Grady . . . ."

131. The Starfish Parties responded that same day explaining how Underwriters had been apprised all along, how the additional components of the $1.5 million cash demand that differed from the $2.4 million, and reminding Underwriters of their opportunity to resolve the claim previously but their failure to assist in any way.

132. Without hearing any additional response from Underwriters, the Starfish Parties followed up to advise on the status of the O'Grady settlement on January 30, 2023 and once again requesting assistance pursuant to the Policies' requirements.

133. On February 7, 2023, without any response from Underwriters, the Starfish Parties advised Underwriters of the settlement, the need for Underwriters' contribution, and how timing remained of the essence.

134. On February 16, 2023, the Starfish Parties confirmed payment of $2,400,000 to settle the O'Grady Arbitration and forwarded a wire confirmation to Underwriters evidencing the same.

135. In addition, Starfish bore $30,661.37 in fees for its attorneys and the AAA, which should have been covered under the Phase 3 Policy as Defence Costs.

## UNDERWRITERS UTTERLY FAILED TO COVER OR HELP DEFEND THE STARFISH PARTIES

136. Underwriters have to date not paid a single dollar towards any of the defense costs and resulting damages in the four underlying claims, and instead forced their insureds to go it alone.

137.    Despite knowing about all four claims since at least 2020, in March/April of 2023, Underwriters sent drafts of potential letters claiming to reserve their rights at a time when Underwriters had long since waived any right to assert coverage defenses.

138.    Underwriters are precluded from asserting any policy defenses at this point. *See, e.g., Hagen v. U.S. Fid. & Guar. Ins. Co.*, 138 Ariz. 521, 525 (1983) ("Failure to act promptly may result in a waiver of the right to deny coverage or an estoppel to assert an exclusion"); *Equity Gen. Ins. Co. v. C & A Realty Co., Inc.*, 148 Ariz. 515, 518 (App. 1985) ("An insured is entitled to know *early in the litigation process* whether the insurer intends to honor [its] duty in order that the insured may take steps to defend himself").

## <u>COUNT I</u>
### (Breach of Contract)

139.    The Starfish Parties incorporate the foregoing paragraphs as if fully set forth herein.

140.    The Starfish Parties and Underwriters are parties to the Policies, which are express contracts.

141.    The Policies are valid and enforceable contracts.

142.    The Starfish Parties have performed all their obligations under the Policies.

143.    The losses described in all four claims herein were compensable either as Defence Costs pursuant to Paragraph 4 of the Policies or as liability arising out of or in connection with any Product pursuant to Paragraph 10 of the Policies.

144.    Underwriters' denial of the Starfish Parties' claim for indemnity of all four losses and failure to promptly pay for those losses constitutes a material breach of the Policies.

145.    As a direct and proximate result of Underwriters' breach of the Policies, the Starfish Parties have sustained damages in an amount to be proven at trial.

146.    This cause of action arises out of a contract between the Starfish Parties and Underwriters, entitling the Starfish Parties to an award of their reasonable attorneys' fees and costs.

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

Snell & Wilmer

L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

## COUNT II
### (Bad Faith)

147.    The Starfish Parties incorporate the foregoing paragraphs as if fully set forth herein.

148.    Underwriters owe the Starfish Parties a duty of good faith and fair dealing with respect to their treatment of the Starfish Parties under the Policies in all four underlying claims.

149.    Underwriters' unjustified and unreasonable failure to defend, or even promptly communicate, with the Starfish Parties in all four underlying claims is directly contradicted by the Policies' clear terms.

150.    The Policies contain an implied covenant of good faith and fair dealing on the part of Underwriters.

151.    That duty dictates that Underwriters refrain from acting in a manner that would impair the right of the Starfish Parties to receive the benefits that flow from, and that the Starfish Parties have a right to expect, under the Policies.

152.    Underwriters breached their duty of good faith and fair dealing when they intentionally, knowingly, and without reasonable basis failed to provide a defense and indemnification to the Starfish Parties in matters the Starfish Parties had been requesting coverage, or even a position on, for years.

153.    Underwriters failed to conduct a timely, reasonable, adequate, and unbiased investigation of the facts and law concerning coverage under the Policies.

154.    Underwriters failed to adequately consider information provided by the Starfish Parties in support of their claims under the Policies.

155.    Underwriters failed to timely provide their coverage position to the Starfish Parties, rather they forced the Starfish Parties to go it alone while knowingly lying in wait to deprive the Starfish Parties of the Policies' benefits.

156.    Underwriters' knowing or reckless failure to provide a defense and indemnification, or even provide a final position, on the Starfish Parties' coverage for the

underlying actions is directly contrary to the Policies' terms and Underwriters' duty of good faith and fair dealing.

157.    Underwriters knowingly or recklessly failed to provide for a defense and indemnification to the Starfish Parties despite the Starfish Parties providing Underwriters with multiple notices and requests for participation and a coverage decision.

158.    Underwriters knowingly or recklessly failed to provide for a defense and indemnification despite knowing that the Policies required Underwriters' participation.

159.    Underwriters knowingly or recklessly breached their duty of good faith and fair dealing by failing to pay, and by withholding for an unreasonable period of time, payment covered under the Policies.

160.    Underwriters have further knowingly or recklessly breached their duty of good faith and fair dealing by taking an inordinate amount of time to "investigate" the claims, have failed to provide a coverage determination within a reasonable period of time, have failed to participate in the Starfish Parties' defense, have failed to assist in potential settlement that would have reduced the Starfish Parties' ultimately liability, and have taken unreasonable and unsustainable positions in their recently created reservation of rights letters.

161.    Underwriters have no reasonable basis for knowingly or recklessly refusing to pay amounts covered under the Policies and for taking the do-nothing approach set forth above.

162.    Underwriters intentionally or recklessly required the Starfish Parties to file suit to secure their rights and benefits under the Policies, and such conduct was unreasonable.

163.    As a direct and proximate result of Underwriters' bad faith, the Starfish Parties have suffered economic, consequential, and general damages in an amount to be proven at trial.

164.    Underwriters' failure to pay and related stonewalling of its insureds was done with an "evil mind," to serve its own interests, and with a conscious disregard of the Starfish

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

Parties' rights and interests. Accordingly, the Starfish Parties are entitled to an award of punitive damages against Underwriters in an amount sufficient to punish and deter Underwriters and other similarly situated insurance companies from engaging in similar conduct in the future.

165.    This claim arises from contracts between the Starfish Parties and Underwriters, entitling the Starfish Parties to an award of their reasonable attorneys' fees and costs.

### COUNT III
**(Declaratory Judgement)**

166.    The Starfish Parties incorporate the foregoing paragraphs as though fully set forth herein.

167.    This cause of action is raised under A.R.S. §§ 12-1831 through 12-1846, and/or any other applicable law.

168.    There is a present and judiciable dispute between the Starfish Parties and Underwriters regarding the parties' respective rights and interests under the Policies.

169.    The Starfish Parties are entitled to indemnification from Underwriters under the Policies for their losses resulting from the payments made in connection with all four matters outlined above.

170.    Underwriters disputes and denies any obligation to indemnify the Starfish Parties for their losses.

171.    The Starfish Parties are entitled to a declaratory judgment from this Court holding that Underwriters is obligated to indemnify the Starfish Parties for all four losses.

172.    This cause of action arises out of a contract between the Starfish Parties and Underwriters, entitling the Starfish Parties to an award of their reasonable attorneys' fees and costs.

Snell & Wilmer
L.L.P.
LAW OFFICES
One East Washington Street, Suite 2700
Phoenix, Arizona 85004-2556
602.382.6000

1    **<u>REQUESTED RELIEF</u>**

2        WHEREFORE, Plaintiffs requests that judgement be entered in tis favor and against

3    Defendant as follows:

4        A.    For a declaratory judgment declaring that Defendant is obligated to indemnify

5    and pay the full amount of Plaintiffs' losses;

6        B.    For an award of compensatory, consequential, and incidental damages

7    resulting from Defendant's breaches of the Policies in an amount to be proven at trial;

8        C.    For an award of Plaintiffs' damages incurred as a result of Defendant's bad

9    faith;

10       D.    For an award of punitive damages against Defendant in a just and reasonable

11   amount sufficient to punish and deter Defendant and other similarly situated insurance

12   companies from engaging in similar conduct in the future;

13       E.    For an award of Plaintiffs' reasonable attorneys' fees and taxable costs that

14   Plaintiffs incur herein pursuant to A.R.S. §§ 12-341 & 341.01, as well as any other

15   applicable law;

16       F.    For pre-judgment interest and post-judgment interest as and to the fullest

17   extent permitted by law; and

18       G.    For such other and further relief as the Court deems just and proper.

19       DATED this 22<u>nd</u> day of June 2023.

20                                        SNELL & WILMER L.L.P.

21

22                                   By: */s/ Anthony W. Merrill*
                                         _____
23                                       Anthony W. Merrill
                                         Jonathan G. Brinson
24                                       Ryan P. Hogan
                                         One East Washington Street, Ste. 2700
25                                       Phoenix, Arizona 85004
                                         Telephone: 602.382.6000
26                                       Facsimile: 602.382.6070
27                                       *Attorneys for Plaintiffs*

28